Argued June 5, reversed and remanded September 6, 1974

DEVLIN, *Respondent, v.* MILWAUKIE COVENANT
CHURCH ET AL, *Appellants.*
525 P2d 998

*Norman L. Lindstedt* of Buss, Lichner, Lindstedt, Barker & Buono, Portland, argued the cause and filed briefs for the appellants.

*John C. Anicker, Jr.,* Oregon City, argued the cause and filed a brief for respondent.

O'CONNELL, C. J.

Plaintiff brought this action to foreclose a mechanic's lien. Defendants answered by way of general denial and also counterclaimed for damages on the ground of an alleged breach of contract. The trial court held in favor of plaintiff, and defendants appeal.

In early 1970, defendant Milwaukie Covenant Church decided to construct a new church building. The congregation retained Donald Lindgren, an architect who had specialized in church design, to plan the structure. After the plans and specifications were completed, Lindgren recommended that defendant employ

plaintiff to act as general contractor. The church was interested in cutting costs by having congregation members do some of the labor, an arrangement which plaintiff was willing to accept. Plaintiff inspected the site and examined the plans and specifications, after which he got in touch with several potential subcontractors, prepared a cost estimate and on March 16, 1971, sent the following "Contractor's Proposal" to the church:

"Sirs:

"I am pleased to report that we can construct your Church Building, plans by Donald Lindgren Architect, for the amount of One Hundred Forty Four Thousand Dollars ($144,000). This amount does not include Electrical, Carpet, or Appliances.

"The above price may be reduced by Volunteer labor as much as is available and also by changes in specifications and securing additional Subcontract bids.

"Thank you,
/sgd/ Edward L. Devlin
Edward L. Devlin"

Thereafter, on July 14, 1971, the parties entered into a contract prepared by plaintiff using Standard Form Contract A 111, published by the American Institute of Architects (AIA). The contract is entitled "Standard Form of Agreement Between Owner and Contractor where the basis of payment is the Cost of the Work Plus a Fee." Article 7 of this contract provides that plaintiff's fee was to be $14,400. Article 6, entitled "COST OF THE WORK AND GUARANTEED MAXIMUM COST," provides:

"6.2 The maximum cost to the Owner, including the Cost of the Work and the Contractor's Fee, is guaranteed not to exceed the sum of One hundred forty-four thousand and no/100 dollars

($144,000.00); such Guaranteed Maximum Cost shall be increased or decreased for Changes in the Work as provided in Article 8.

> "All savings made by the use of Volunteer Church Workers, trade discounts, changes in material specification, and lower bids by subcontractors will be deducted from contract maximum amount.
>
> "The above amount does not include any electrical work."

Construction work began shortly after the execution of the contract. Almost immediately, for reasons which need not be discussed here, the actual cost of construction exceeded the estimates which plaintiff had used in preparing his Contractor's Proposal. The first application for payment, submitted in August to Lindgren for approval pursuant to Article 9 of the "GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION",[1] was for an amount greater than was then available to the church. Lindgren approved payment of this amount and the church disbursed all available funds, making up the difference as the rest of its funding was received. The September application for payment was also approved by Lindgren and paid by the church. In October, November and December, however, Lindgren refused to approve payment of the full amounts applied for by plaintiff. Two bases appear to have led Lindgren to this action. Costs continued to outpace estimates and he began to doubt that plaintiff could "finish the job for the balance that he said he could do it for." Additionally, Lindgren sought documentation of certain expenses because actual progress did not appear to correspond

---

[1] AIA Document A 201, incorporated into the Owner-Contractor Agreement by Article 1 of that agreement.

to alleged expenditures and plaintiff did not produce such documentation promptly.

During this period, a separate dispute arose concerning plaintiff's procurement of a contractor's bond. Plaintiff claimed that the church had orally waived the contract requirement that he supply such a bond. The church disagreed. Finally, Lindgren and the church, in December, asked plaintiff to supply proof that he could complete the project within the contract guaranteed maximum cost. Plaintiff submitted a statement indicating that work would be completed for $140,000, but the church and architect rejected this figure as unrealistic and continued to withhold approximately $13,000. On January 7, 1972, plaintiff sent the church a letter stating that unless, within seven days, he received all sums for which he had applied he would stop work. No payments were made and plaintiff left the project on January 13. The church then hired a new supervisor and completed construction.

At trial, plaintiff contended that three alleged inconsistencies among the provisions of the three contract documents[2] rendered the agreement unenforceable and sought recovery on a quantum meruit theory. Conversely, defendants argued that the agreement was an enforceable contract under which plaintiff agreed to construct the church building for a sum not to exceed $144,000 and sought damages for the

---

[2] These documents were: (1) Defendants' "Contractor's Proposal," quoted *supra;* (2) the Owner-Contractor Agreement based on AIA Document A 111, which incorporated the General Conditions of the Contract for Construction, AIA Document A 201; (3) the plans and specifications prepared by the Architect Lindgren (which were also incorporated by reference into the Owner-Contractor Agreement).

amount by which actual costs exceeded that figure. The trial judge neither accepted nor rejected either position. Rather, he construed the transaction as a cost-plus-fee arrangement with no fixed maximum. He then determined the amount actually expended by plaintiff prior to his leaving the project, held the church responsible to pay this amount, and awarded plaintiff 10% of this sum as his fee.[9]

■ We cannot accept the trial court's construction of the contract. Article 6, as noted above, clearly provided that "the maximum cost to the Owner, including the Cost of the Work and the Contractor's Fee, is guaranteed not to exceed the sum of One hundred forty-four thousand and no/100 dollars * * *; such Guaranteed Maximum Cost shall be increased or decreased for Changes in the Work as provided in Article 8." Consequently, if an enforceable contract existed at all, it protected the church against any costs in excess of this amount.

■ We are also of the opinion that the alleged inconsistencies relied on by plaintiff are neither real nor significant enough to render the contract unenforceable. Plaintiff points first to the form of bid required by the various contract documents and notes that whereas the architect's specifications provided for a firm bid, the Owner-Contractor Agreement was labeled a "cost-plus-fee" contract. Second, he argues

---

[9] The trial court does not explain the source of this 10% figure. Apparently, the judge simply divided the total contract price figure ($144,000) by the contractor's contract fee ($14,400). This calculation is, of course, inconsistent with the trial court's determination that the $144,000 figure did not constitute a guaranteed, fixed, maximum cost. It may also be noted that a fee of $14,400 based upon a total expenditure including the fee, would be more than 10%.

that whereas the specifications provided for periodic payments based on the percentage of work completed, the Owner-Contractor Agreement based payments on actual expenditures. Finally, he points out that whereas the specifications placed the burden of the cost of the contractor's bond 'on the contractor, the Owner-Contractor Agreement placed it on the owner.

These distinctions are for the most part illusory. As to the first, it is true that the Owner-Contractor Agreement was not a true "firm bid" or "lump sum" contract. However, it did fix a "guaranteed maximum cost" and obligated the church to pay that full amount if actual expenses warranted. As to the second, again the distinction is more apparent than real. The architect testified that he anticipated that the rate of expenditure and the rate of building progress would coincide. Indeed, it was the absence of this coincidence which first caused him alarm. Moreover, if it is conceded that the Owner-Contractor Agreement set a fixed maximum cost, it is apparent that this coincidence was essential to a satisfactory completion of the contract.

■ With respect to the plaintiff's last point, we do not believe he is in a position to rely on any of the documentary provisions regarding the contractor's bond, since it has consistently been his position that the church orally waived the bonding requirement altogether.

■ Consequently, it is our opinion that the parties entered into an enforceable contract whereby plaintiff agreed to construct a church for actual costs plus a fee of $14,400, the total cost to the church not to ex-

ceed $144,000.④ Moreover, the record indicates that the plaintiff, rather than the defendant, breached the contract. Although the contractor was entitled to stop work on seven days' notice if he did not receive a periodic payment,⑤ he was entitled to do so only if he was then entitled to such payment. Under the General Conditions which were incorporated into the contract, all applications for payment by the contractor had to be submitted to and approved by the architect before the owner was required to dispense the amount. The architect, in turn, was permitted to approve the application only if in his judgment work was progressing satisfactorily, requests for payment corresponded to actual work done, and it appeared work could be completed for the unpaid balance of the contract sum.⑥ Moreover, upon request the contractor was required

④ This view is supported by commentary supplied by the AIA concerning its form contracts. AIA, Architect's Handbook of Professional Practice, Chapter 17 Owner-Contractor and Contractor-Subcontractor Agreements (1973) discusses this form of agreement. It is noted, at p. 8: "Under this Agreement the Contractor's Fee is fixed in advance and the Contractor guarantees a limit of construction cost that will not be exceeded."

⑤ Article 9.6.1 of the General Conditions: "If the Architect should fail to issue any Certificate for Payment, through no fault of the Contractor, within seven days after receipt of the Contractor's Application for Payment, or if the Owner should fail to pay the Contractor within seven days after the date of payment established in the Agreement any amount certified by the Architect or awarded by arbitration, then the Contractor may, upon seven additional days' written notice to the Owner and the Architect, stop the Work until payment of the amount owing has been received."

⑥ Article 9.4.2: "The issuance of a Certificate for Payment will constitute a representation by the Architect to the Owner, based on his observations at the site as provided in Subparagraph 2.2.4 and the data comprising the Application for Payment, that the Work has progressed to the point indicated that, to the best of his knowledge, information and belief, the quality of the Work is in accordance with the Contract Documents (subject to an evalua-

to supply documentary support for his application for payment to establish that the amounts had actually been spent.[7] Disputes concerning amounts due were to be submitted in the first instance to the architect for decision,[8] and either party thereafter was entitled

---

tion of the Work as a functioning whole upon Substantial Completion, to the results of any subsequent tests required by the Contract Documents, to minor deviations from the Contract Documents correctable prior to completion, and to any specific qualifications stated in his Certificate); and that the Contractor is entitled to payment in the amount certified. In addition, the Architect's final Certificate for Payment will constitute a further representation that the conditions precedent to the Contractor's being entitled to final payment as set forth in Subparagraph 9.7.2 have been fulfilled. However, by issuing a Certificate for Payment, the Architect shall not thereby be deemed to represent that he has made exhaustive or continuous on-site inspections to check the quality or quantity of the Work or that he has reviewed the construction means, methods, techniques, sequences or procedures, or that he has made any examination to ascertain how or for what purpose the Contractor has used the moneys previously paid on account of the Contract Sum."

Article 9.5.1.4: "The Architect may decline to approve an Application for Payment and may withhold his Certificate in whole or in part if in his opinion he is unable to make representations to the Owner as provided in Subparagraph 9.4.2. The Architect may also decline to approve any Applications for Payment or, because of subsequently discovered evidence or subsequent inspections, he may nullify the whole or any part of any Certificate for Payment previously issued to such extent as may be necessary in his opinion to protect the Owner from loss because of * * * * * reasonable doubt that the Work can be completed for the unpaid balance of the Contract Sum."

[7] Article 9.3.1: "At least ten days before each progress payment falls due, the Contractor shall submit to the Architect an itemized Application for Payment, supported by such data substantiating the Contractor's right to payment as the Owner or the Architect may require."

[8] Article 2.2.6: "The Architect will be, in the first instance, the interpreter of the requirements of the Contract Documents and the judge of the performance thereunder by both the Owner and Contractor. The Architect will, within a reasonable time, render such interpretations as he may deem necessary for the proper execution or progress of the Work."

to have the architect's decision submitted to arbitration.[9] In the present case, the architect testified that he refused to approve full payment on the third and fourth applications for payment because actual costs were consistently exceeding estimates, the contractor failed to supply him with documentation to support his applications when requested to do so, and in some cases the ratio of labor expenditures to material costs was exorbitant. In each case, his decision appears from the record to have been justified. Consequently, the defendant was acting within its contract rights when it refused to make the requested payments and the contractor's work stoppage constituted a breach.

The decision of the trial court is reversed and the case is remanded with instructions that the trial judge fix and assess damages in a manner consistent with this opinion.

---

[9] Articles 2.2.10 and 2.2.11.